[Civ. No. 19408. Third Dist. July 31, 1981.]

YOUNG LIFE CAMPAIGN, Plaintiff and Respondent, v.
DOUGLAS X. PATINO, as Director, etc., Defendant and Appellant.

[Civ. No. 19409. Third Dist., July 31, 1981.]

MOUNT HERMON ASSOCIATION, INC., Plaintiff and
Respondent, v.
DOUGLAS X. PATINO, as Director, etc., Defendant and Appellant.

560

COUNSEL

George Deukmejian, Attorney General, Edward P. Hollingshead and Derry L. Knight, Deputy Attorneys General, for Defendant and Appellant.

Turner & Sullivan and Richard K. Turner for Plaintiffs and Respondents.

OPINION

**BLEASE, J.**—The Director of the Employment Development Department of the State of California (director) appeals from judgments[1] which determined that taxpayers, Young Life Campaign (an evangelical Christian organization primarily concerned with adolescents) and Mount Hermon Association, Inc. (which operates a camp in the Santa Cruz mountains to which families and groups subscribing to its nondenominational Christian "Statement of Faith" go for religious conferences and retreats), were "church[es]" within the meaning of section 634.5, subdivision (a), of the Unemployment Insurance Code, which excludes from coverage under the unemployment and disability insurance laws services performed for "... (1) a church or convention or association of churches, or (2) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches."[2] The director contends that the trial court erred in interpreting the term "church" to embrace taxpayers because they "perform[] functions identical to traditional churches in purpose, Bible, creed, doctrine, and worship." He urges us to adopt a narrower definition. We affirm the judgments.

FACTS

A.

Taxpayer Young Life Campaign (Young Life) is an incorporated nonprofit Christian youth organization having no official connection with any denominational church body. It was founded in 1941 by a

---

[1] The cases are consolidated for resolution on appeal.

[2] Prior to its repeal in 1971 and its supersession by section 634.5, Unemployment Insurance Code section 634 exempted "service performed in the employ of a corporation, community chest, fund or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes ...." This comported with the exemption recognized under the Federal Unemployment Tax Act (FUTA). (Former 26 U.S.C. § 3306(c)(8), as amended Pub.L. No. 86-778, § 533, 74 Stat. 944 (1960).) In 1970 Congress narrowed the exemption, as applied to the states, to bring most nonprofit employers within the coverage of their laws. (26 U.S.C. § 3309(b)(1), Pub.L. No. 91-373, 84 Stat. 695 (1970).) In response to this legislation, Unemployment Insurance Code section 634.5 was enacted in language substantially identical to the federal law. (Stats. 1971, ch. 1107, § 21, eff. Oct. 18, 1971; repealed and reenacted [without change in the provision in question], Stats. 1978, ch. 2, §§ 36, 36.5, operative July 1, 1978.) The federal scheme contains a 90 percent federal tax credit incentive to induce states to maintain their unemployment insurance programs in conformity with FUTA. (26 U.S.C. §§ 3302(c)(1), 3303, 3304(a).) In California, Un-

Presbyterian minister for the purpose, according to its articles, of supporting "a benevolent, charitable, educational and missionary undertaking, particularly to encourage Christian young people to continue their spiritual life, which shall be manifested in Bible study, prayer and consistent Christian living."[3]

A major element of Young Life's activities in pursuit of its purpose is a weekly "club meeting." It is usually conducted at a private home by a member of the Young Life staff (many of whom are ministers ordained by denominational churches), or by a volunteer leader. "Club meetings" usually begin with several songs, followed by a skit or game or other "fun time," then perhaps some announcements or a participant's "shar-[ing of] his own faith," and then a "club talk" or sermon by the leader, followed by more songs. The meetings are held in the evening and last about an hour.

There are also weekly "campaigner" meetings, often in a private home, at which adolescents who have progressed to the point of "accept[ing] the Christian faith" engage in Bible study, enjoy the fellowship of others sharing their commitment and discuss life and the Christian faith. In addition, Young Life conducts many weekend and week-long excursions at its various camps, at which religious programs and personal counseling are combined with recreational activities. Young Life also operates five facilities caring for runaways.

Young Life subscribes to a nondenominational Christian Statement of Faith, to which all but perhaps 100 of Young Life's total staff of 650, including all of its management and ministerial staff, as well as its board of trustees, must adhere. The board includes several pastors of denominational churches as well as laymen. Young Life does not ordain

---

employment Insurance Code section 101 renders inoperative any contribution or payment provision of the code which falls out of conformity with the "national plan" because of a change in federal law.

[3]This purpose is expanded upon in Young Life's "Constitution": "The purpose shall be to promote an evangelistic Christian testimony among high school and college age young people by any and every means as God directs. [¶] A. To introduce the Gospel of the Lord Jesus Christ to young people who are not personally committed to him, particularly to the unchurched and the ex-churched. [¶] B. To encourage, among young people who are personally committed to Christ, the development of a spiritual life which shall manifest itself in consistent Christian virtues and activities, including loyal and active participation within the organized church. [¶] Under the direction of the Board of Directors and the staff, these general aims shall be implemented by such activities as neighborhood meetings in different communities, by camping programs, by evangelistic meetings, and by printed publications."

ministers, but its executive director, all of its 5 divisional and 22 regional directors and a majority of its 350 area directors (local ministerial staff) were ordained, either by a denominational church or by an ordaining body such as the Evangelical Christian Alliance. Its field staff undergo a six-month graduate course at Young Life's Institute of Youth Ministries at the Fuller Theological Seminary in Pasadena, unless they are graduates of a seminary. There are another 200 to 250 direct ministry staff. In addition, about 5,000 college students and adult volunteers, some of them ordained ministers, supplement Young Life's field staff. These volunteers are trained by the local area directors and must subscribe to the Young Life Statement of Faith. From time to time the ordained ministers administer sacraments, such as baptism, marriage and the Eucharist.

About 60,000 adolescents participate in Young Life activities each week, some 80 percent of whom are not affiliated with a denominational church. Young Life works closely with denominational churches and encourages its participants to develop ties to them, partly because its ministry is primarily directed to adolescents (though it has recently expanded its ministry to adults). It does not seek to "convert" adolescents to the Young Life "church," or to "compete" with more traditional churches, but rather seeks to lead them to accept the Christian faith. It does not ask them, specifically, to subscribe to the Young Life Statement of Faith, but it conveys the essential content of the statement in "club talks" and counseling with adolescents interested in "commit-[ting]" themselves to Christ. Young Life did not hold itself out as a church in 1972 and, in fact, in one brochure it affirmatively stated that it was not a church, because the adolescents whom it sought to reach reacted negatively to traditional churches.

### B.

Taxpayer Mount Hermon Association, Inc. (Mount Hermon), is a nonprofit corporation, founded in 1906 and incorporated in 1929, which operates a complex of nondenominational Christian conference centers in a forest setting in the Santa Cruz Mountains. Its purpose is to propagate the Christian gospel and nurture the faith of those who have accepted it. According to its articles of incorporation, its purpose is: "'(1) To organize, promote, maintain and control the Mount Hermon Summer Assembly and other meetings and conventions for biblical, missionary, evangelistic, and educational purposes; [¶] (2) To organize, promote, maintain and control missionary and evangelistic enterprises,

[July 1981]

schools, colleges, hospitals, and other Christian agencies of similar character for the public spiritual and moral good." Mount Hermon considers its rustic setting and the fact that people usually stay there for several days at a time to be useful in communicating its Christian message.

Mount Hermon operates three contiguous camps (Redwood Camp, Ponderosa Lodge and Mount Hermon Center), whose programs are directed, respectively, toward elementary and junior high school students, high school and college students, and adults. The facilities are open year-round, but are used most intensively through the summer. Programs include conferences for pastors, families and single adults, and Bible study. A typical summer family program lasts a week and involves morning services and religious discussion for adults and child-care and Sunday school classes for children, afternoon recreational activities, and an evening service. Activities at Redwood Camp and Ponderosa Lodge combine recreation and religious discussions and personal counseling, moderated by counselors, most of whom are not ordained, though many are seminary students.

Sunday worship services are held year-round, usually by Mount Hermon staff members. During the summer these "typical Protestant" services are heavily attended, with 1,000 to 2,000 participants each week; during the winter the services may be attended by as few as 15 to 20 people and are sometimes permitted to be conducted by the particular conference group. Nevertheless, a number of people who live nearby attend services at Mount Hermon substantially every Sunday, some tithe to it and many people come every summer to Mount Hermon. Ministers on Mount Hermon's staff dispense the sacraments of baptism, communion and matrimony, though Mount Hermon does not promulgate rigid forms for their dispensation, leaving that to the ministers who have varying denominational backgrounds. The ministers visit hospitals and make home visits. Mount Hermon also operates a Sunday school on the grounds for all ages.

All of Mount Hermon's thirty-five staff members (which includes six or seven ministers, as well as cooks, housekeepers and administrative and clerical personnel) and its board of trustees must subscribe to a nondenominational Christian Statement of Faith. In order to use Mount Hermon's facilities, a group must conform to the Statement of Faith, though individuals need not, since to require such adherence would defeat Mount Hermon's evangelistic purposes. Mount Hermon

considers itself "interdenominational," in that it is "concerned about the whole denominational spectrum." It therefore declines to become involved in denominational disputes or to "convert" people from traditional churches. It numbers among its "congregation" everyone who has a "continuing interest" in Mount Hermon.

## C.

Following the amendment of Unemployment Insurance Code section 634.5 in 1971, Young Life was assessed $3,386.58 in disability insurance taxes by the director's predecessor agency; it chose to take advantage of a provision permitting nonprofit organizations to contribute to the unemployment insurance fund on an "added cost of benefits paid" basis. (Unemp. Ins. Code, § 803, subd. (b)(1); 26 U.S.C. §§ 3304 (a)(6)(B), 3309(a)(2).) Mount Hermon was similarly assessed, in the sum of $5,316.88. Both organizations were found by Unemployment Insurance Appeals Board referees to be "churches," but the decisions were reversed by the board. (In re Young Life Campaign (1977) Precedent Tax Decision, P-T-337; In re Mount Hermon Ass'n. (1977) Precedent Tax Decision, P-T-335.)

Both cases were tried, de novo, in the Superior Court of Sacramento County, as was authorized by former Unemployment Insurance Code section 1182 (now § 1241). The court ruled that taxpayers are "church[es]" within the meaning of the exemption. The director appealed.

## DISCUSSION

Definitional problems lie at the core of church-state issues. As to tax (and other) matters, they are of ancient respectability. "The Bible relates that when the Pharisees asked Jesus whether it was permissible to pay taxes to Caesar, Jesus replied that one should 'Render unto Caesar the things that are Caesar's and unto God the things that are God's.'" (Schwarz, *Limiting Religious Tax Exemptions: When Should the Church Render unto Caesar?* (1976) 29 U.Fla.L.Rev. 50.) In view of Christ's tenuous relations with the Pharisees, he wisely left undefined things Caesar and things God.

A not dissimilar judicial prudence counsels against a premature and preemptive definition of "church," for purposes of exemption from the unemployment insurance tax laws.

This case touches upon the definitional core in its modern, constitutional setting. It tenders the meaning of things "church" in the unemployment insurance tax law, a term which Congress, in studied silence, left undefined.

■ The director urges that, the "church" exemption be narrowly defined to effectuate the purposes of the unemployment insurance laws. (Cf. *Cal. Emp. Com.* v. *Butte County etc. Assn.* (1944) 25 Cal.2d 624, 630-631 [154 P.2d 892] [agricultural labor exemption].) He suggests that "church" "means an assembly of persons of the same faith who worship together under standards, rites and doctrines established by the organization." Young Life and Mount Hermon would have us put meaning into "church" by use of the "functional" criteria, applied by the trial court in the light of First Amendment concerns. We take the latter direction. This course is doubtless not comforting to the tax man, but it serves to steer clear of constitutional obstacles.

As the United States Supreme Court has (again) recently said in construing (on another point) the exemption here at issue: "A statute, of course, is to be construed, if such a construction is fairly possible, to avoid raising doubts of its constitutionality." (*St. Martin Evangelical Lutheran Church* v. *South Dakota* (1981) 451 U.S. 772, 780 [68 L.Ed. 2d 612, 619, 101 S.Ct. 2142]; see also *United States* v. *Seeger* (1965) 380 U.S. 163 [13 L.Ed.2d 733, 85 S.Ct. 850]; *NLRB* v. *Catholic Bishop of Chicago* (1979) 440 U.S. 490 [59 L.Ed.2d 533, 99 S.Ct. 1313].) We take that advice.

The determination of what is a "church," like "[t]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . ." (*Thomas* v. *Review Board of the Indiana Employment Security Division* (1981) 450 U.S. 707, 714 [67 L.Ed.2d 624, 631, 101 S.Ct. 1425].) The task is made more delicate by the overlapping, yet potentially conflicting, constitutional proscriptions against the burdening of the free exercise of religion and against the undue entanglement of the state with religion.[4] The clauses do not serve identical purposes and the United States Supreme Court, so it says, "has strug-

---

[4] The problem arises in a significant way because since *Walz* v. *Tax Commission* (1970) 397 U.S. 664 [25 L.Ed.2d 697, 90 S.Ct. 1409], the "wall of separation between church and state" (*Everson* v. *Board of Education* (1947) 330 U.S. 1, 16 [91 L.Ed. 711, 67 S.Ct. 504, 168 A.L.R. 1392]), if there ever was one (see Tribe, American Constitutional Law (1978) Rights of Religious Autonomy, § 14-4, pp. 819-823), is now more in the nature of a semipermeable membrane which filters out that which is excessive governmental entanglement with religion.

gled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." (*Walz v. Tax Commission* (1970) 397 U.S. 664, 668-669 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].)[5] Since *Walz* the failure to exempt a religious organization from a tax may unduly entangle the state with religion in violation of the establishment clause. But the exemption itself, by embracing only churches and not other religious organizations, arguably countenances an impermissible discrimination.[6] Although we skirt these problems,

---

[5]The sensitive First Amendment considerations involved in the present exemption are illustrated by taxpayers' claim that coverage of them and other religious organizations would entail significant state intrusions in their affairs in the form of inspections of their employment and financial records (see Unemp. Ins. Code, § 317), oversight over their accounting procedures and, most importantly, possible confrontations over what constitutes "good cause" for terminating an employee (e.g., a counselor's "heresy" or "apostasy"). (See Unemp. Ins. Code, § 1256.) The free exercise clause *may not demand* the exemption as taxpayers assert (see *Mitchell v. Pilgrim Holiness Church Corp.* (7th Cir. 1954) 210 F.2d 879, 883-884, cert. den. 347 U.S. 1013 [98 L.Ed. 1136, 74 S.Ct. 867] [Fair Labor Standards Act applies to church employee]; see also *Sherbert v. Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790]; *Wisconsin v. Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526]), but "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." (*Walz v. Tax Commission, supra,* 397 U.S. at p. 673 [25 L.Ed.2d at p. 704, 90 S.Ct. 1409].) The risks of entanglement cited by taxpayers support Congress' decision to exempt churches from the unemployment insurance laws and demand a broad reading of the exemption. (*Grace Lutheran Church v. N. D. Employment* (N.D. 1980) 294 N.W.2d 767, 772-774 [interpreting "church exemption" to embrace church-related schools]; *Christian School Assn. v. Com. Dept. of Labor* (Pa. 1980) 423 A.2d at pp. 1344-1345 [same]; see also *NLRB v. Catholic Bishop of Chicago* (1979) 440 U.S. 490, 502-504 [59 L.Ed.2d 533, 542-543, 99 S.Ct. 1313] ["risk" that First Amendment would be infringed by board's jurisdiction over parochial school teachers mandated clear expression of affirmative Congressional intent to cover them].)

[6]Understandably, none of the parties challenges the constitutionality of benefitting "churches" by exempting them from compulsory taxation and we therefore do not reach the issue. It is a subtle question, though, whether Congress may constitutionally accord an exemption to some, but not all, religious organizations, distinguishing among them based on their "church"-ness or affiliation with a "church or convention or association of churches." (See *Christian School Assn. v. Com. Dept. of Labor, supra,* 423 A.2d at pp. 1346-1347 [invalidating requirement that religious schools be "'operated, supervised, controlled or principally supported by a church or convention or association of churches'" but upholding exemption based on remaining portion which refers to "an organization which is operated primarily for religious purposes"]; see also Whelan, *"Church" in the Internal Revenue Code; The Definitional Problems* (1977) 45 FordhamL.Rev. 885, 923-928; Worthing, *"Religion" and "Religious Institutions" Under the First Amendment* (1980) 7 Pepperdine L.Rev. 313, 344-345, 350-353.)

they remain the background against which the definitional problem is resolved.[7]

The board, in its precedent tax decisions in the Young Life and Mount Hermon cases, rested its conclusions, respectively, upon the "traditional meaning" and "general understanding" of the term "church." In the Young Life case, the board defined "church" as an "assembly of persons who meet together for religious worship, "[8] but found that the organization did not come within the "traditional meaning" of the term because of its limited ministry (i.e., adolescents), its encouragement of affiliation with traditional churches, its use of clergy ordained by denominational churches, and its failure to hold itself out as a church. In the Mount Hermon case, the board held that Mount Hermon's "major functions . . . are not church functions," concluding that its recreational aspects predominated over "a few hours of Bible studies" moderated by a counselor and "summer . . . church services."

The board's decisions relied on the federal district court decision in *De La Salle Institute* v. *United States* (N.D. Cal. 1961) 195 F.Supp. 891.[9] The issue in that case was whether a winery operated by the

---

[7]The construction of a statute against the background of constitutional value establishes a recursive relation between statute and Constitution. In art, music and mathematics, as in the construction of statutes to preserve their constitutionality, the complementary shapes of background and foreground or figure and ground lend themselves to intricate conceptual relationships. (See Hofstadter, *Godel, Escher, Bach: An Eternal Golden Braid* (1979) Figure & Ground, ch. III, pp. 64-74.)

[8]"[R]eligious worship," is a term no more susceptible of definition than "church." It is settled that it may not be restricted to theistic religions. (*Fellowship of Humanity* v. *Co. Alameda* (1957) 153 Cal.App.2d 673 [315 P.2d 394]; *Washington Ethical Society* v. *District of Columbia* (D.C.Cir. 1957) 249 F.2d 127; cf. *Torcaso* v. *Watkins* (1961) 367 U.S. 488, 495 [6 L.Ed.2d 982, 987, 81 S.Ct. 1680].) "[W]orship" may take a wide varity of forms. (*Fellowship of Humanity* v. *Co. Alameda, supra*, 153 Cal.App.2d at pp. 678-679 [meeting including meditation; a song; a reading from a newspaper, magazine, or book (including the Bible); another song; a speaker on a theme of current interest; a collection; announcements; and more meditation]; *People* v. *Woody* (1964) 61 Cal.2d 716, 720-721 [40 Cal.Rptr. 69, 394 P.2d 813] [meeting called spontaneously by "sponsor," at which peyote is distributed and ingested and participants pray, sing and perform rituals]; see *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 108-110 [87 L.Ed. 1292, 1296-1297, 63 S.Ct. 870, 146 A.L.R. 81] [hand distribution of religious tracts is "more than preaching; it is more than a distribution of religious literature. It is a combination of both . . . . This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits."].)

[9]The Young Life decision reflects a conscious adoption by the board of the position taken in the Tax Status Guide of director's predecessor agency, which admitted:

Christian Brothers, a Roman Catholic religious order, was a "church" within the meaning of the term as used in the Unrelated Business Income Tax Law (former 26 U.S.C. § 511(a)(2)(A): Revenue Act of 1950, ch. 994, § 422, 64 Stat. 947; repealed, Pub.L. No. 91-172, § 121, subd. (a)(1) (1969)), the first significant provision in which Congress used the phrase "church [or] convention or association of churches" (Whelan, *"Church" in the Internal Revenue Code; The Definitional Problems* (1977) 45 Fordham L.Rev. 885, 901). The court decided "the winery [was] not a church," concluding that any religious activities connected therewith were "incidental" to its "principal [winemaking] activities".

The court pointed to Congress' silence in the matter. "To exempt churches, one must know what a church is. Congress must either define 'church' or leave the definition to the common meaning and usage of the word; otherwise, Congress would be unable to exempt churches. It would be impractical to accord an exemption to every corporation which asserted itself to be a church. Obviously Congress did not intend to do this...." (*De La Salle Institute* v. *United States, supra*, 195 F.Supp. at p. 903.) "What is a 'church' for purposes of the statute must be interpreted in the light of the common understanding of the word. *An organization established to carry out 'church' functions, under the general understanding of the term, is a 'church.'*" (Italics added.) (*Ibid.*) The court was guided in identifying "church functions" by an interpretative regulation which provided that "[a] religious order [would] be considered to be engaged in carrying out the *functions of a church* if its duties include[d] the ministration of sacerdotal functions and the conduct of religious worship." (Italics added.) (Former Treas. Reg. 26 C.F.R. [Int. Rev. Code 1954] § 1.511-2(a)(3)(ii); *De La Salle Institute* v. *United States, supra*, 195 F.Supp. at p. 900.) The Christian Brothers

---

"There is no definition of a church in the Code nor in Title 22. The common understanding of a church is: 1) the institutional church itself, such as the Catholic Church, the Presbyterian Church, the Methodist Church, American Baptist Convention, American Baptist Association (listed in Yearbook of American Churches); or, 2) a voluntary association of persons united for *discipline* and *worship of God*, connected with and forming a part of, some religious society having a legal existence ...." (Italics added.) Clearly, this "common understanding" is useful only for inclusion of certain traditional churches. But "church" may not constitutionally be interpreted to include only theistic worship. (See *ante*, fn. 2.) A requirement that a church teach "discipline" (at least insofar as it suggests "moral principles") excludes some groups that might otherwise make a strong religious claim—e.g., Greco-Oriental mystery cults. (Note, *Toward a Constitutional Definition of Religion* (1978) 91 Harv.L.Rev. 1056, 1073.)

are not priests and the order's primary activity (education) does not constitute "religious worship," the court concluded.[10]

The trial court's decision looked to the same "functions" adopted in *De La Salle* and followed by the board but refused to make them collectively exclusive. It did not accept the board's narrow view of what is embraced by the "common understanding" of "church," which failed to accord criterial recognition to the more unconventional aspects of taxpayers' ministries—i.e., Young Life's concentration on youth and nondenominational character and Mount Hermon's recreational activities.

Resort to the "common meaning," or customary usage, of "church" is a traditionally appropriate means of determining meaning, given Congress' silence. (Sutherland, Statutes and Statutory Construction (4th ed. 1973) § 46.01, pp. 48-51.) However, because of the First Amendment, the conventional "understanding" of what constitutes a church, which is reflective of established, traditional churches, must not be permitted to reward conventional churches and exclude unorthodox ones. (*Washington Ethical Society* v. *District of Columbia* (D.C.Cir. 1957) 249 F.2d 127; see Note, *Religious Organizations and the Unemployment Insurance Code: Is California Playing Favorites with Churches?* (1979) 10 Pacific L.J. 225, 233-239; Worthing, *"Religion" and "Religious Institutions" Under the First Amendment* (1980) 7 Pepperdine L.Rev. 313, 344-346.)[11]

---

[10]The "church functions" identified in the regulation and referred to by the court raise serious constitutional questions if identified as required characteristics of a church. It was established at trial in the Young Life case that some traditional religious bodies do not ordain priests. We have already observed (see *ante*, fn. 2) that the term "religious worship" is not susceptible of precise definition, and must be interpreted in light of the variety of forms it may take. The regulation in question is no longer effective, however, since the statute under which it was promulgated has been repealed. In 1971, the Internal Revenue Service proposed an essentially identical regulation under Internal Revenue Code section 170, in which churches and conventions or associations of churches were included in a preferred category of charitable organizations, as to which a higher proportion of the donor's income could be deducted for charitable contributions. (Proposed Treas. Reg. § 1.170A-9(a), 36 Fed. Reg. 9298 (May 22, 1971).) The final regulation, promulgated in 1973, abandoned this definitional approach for a studied redundancy: "(a) Church or a convention or association of churches. An organization is described in section 170(b)(1)(A)(i) if it is a church or a convention or association of churches." (Treas. Reg. § 1.170A-9(a) (1973); see Whelan, *supra*, 45 Fordham L.Rev. at p. 917; for a trenchant discussion of the genesis of the definition of "church functions" in former Treasury Regulation 26 C.F.R. (Int. Rev. Code 1954) § 1.511-2(a)(3)(ii), see *Whelan, supra*, at pp. 910-913.)

[11]One authority on theology and religion has described the dangers of an unreflective "common meaning" approach: "Sensing, perhaps, that the power to define what is or is

The director approaches the problem of definition with procrustean enthusiasm. To justify a "traditional" view of "church," he suggests a definition establishing characteristics deemed *collectively essential* to the common understanding of the term: "'[C]hurch' for purposes of the exemption is an entity [1] organized primarily for religious worship [2] by an assembly of persons [3] of the same faith [4] who knowingly and voluntarily worship together as members [5] under and in compliance with standards, religious rites, and doctrines established by the assembly or entity for such worship. [6] The organization must have sufficiently definable organizational structure to be considered an employing unit, [7] must not advocate membership and active participation in other churches while actively participating in its activities, and, [8] its practices and doctrines must be peculiar to itself and unique to the participating assembly." Director most strenuously contends that respondents' nondenominational characters prevent them from being considered "church[es]." Director points out that neither Young Life nor Mount Hermon has or claims to have "peculiar" and "unique" religious rites, practices and doctrines, and that both encourage participation in traditional churches.

For the proposition that *non*denominational religious organizations are not "churches," director relies upon *Vic Coburn Evangelistic Assn. v. Employment Div.* (1978) 35 Ore.App. 655 [582 P.2d 51], and *Chapman v. Commissioner of Internal Revenue* (1967) 48 T.C. 358. In *Vic Coburn*, a traveling evangelistic Christian ministry was held not to be a church, in the absence of a continuing congregation. In the *Chapman* case, the Tax Court of the United States held that the Missionary Dentist, a nonprofit organization whose purpose was to preach the gospel around the world, using dentistry as a means by which to contact people (*id.*, at p. 360), was not a "church" within the contemplation of Internal Revenue Code section 170(b)(1)(A). The court gleaned from a congressional committee report[12] and "phrases appearing throughout the . . .

---

not a legitimate 'religious' activity seems denied them by the Constitution, the courts, when they cannot avoid a decision, turn to some vague 'man in the street' idea of what religion should be: It involves prayer, and has something to do with a deity, etc. But a man-in-the-street approach would surely have ruled out early Christianity, which seemed both subversive and atheistic to the religious Romans of the day. The truth is . . . the Bill of Rights was designed to safeguard minorities from the man-in-the-street's uncertain capacity for tolerance." (Harvey Cox (of the Harvard School of Divinity) in a letter to the editor, N.Y. Times, Feb. 16, 1977, p. 25.)

[12]The report states, in the portion quoted by the tax court: "Your committee understands that 'church' to some denominations includes religious orders as well as other organizations which as integral parts of the church are engaged in carrying out the

legislative history, such as 'under church auspices' and 'as integral parts of the church' that the term is intended to be synonymous with the terms 'denomination' or 'sect' rather than to be used in any universal sense." (*Id.*, at p. 363.)[13] The court concluded: "We think it apparent from this record that the organization in question is not of a type that could be said to be a denomination or sect. It is a group of missionary workers drawn from many Christian churches who give of their time and talents to spread universal Christian beliefs. All its members must be in full communion of an accredited Christian community in order to be affiliated with the organization. It is interdonominational and independent of any connection with the churches with which its members are affiliated. It does not seek converts other than to the principles of Christianity generally and if successful urges these converts to establish their own native churches .... The Missionary Dentist is not a church. It is merely a religious organization comprised of individual members who are already affiliated with various churches." (*Id.*, at p. 364.)

The *Vic Coburn* case is easily distinguishable from the one before us. The Oregon court relied upon a state administrative regulation defining "church" for unemployment tax purposes as "a particular religious group organized as a congregation and conducting regular worship services." (Ore. Admin. Reg. 471-31-090(1)(a).)[14] No similar regulation has been promulgated in California. Moreover, in both the Young Life and Mount Hermon cases, there is evidence that their members have a continuing commitment to and interest in the organizations.

We find the rationale of the *Chapman* decision, if not its holding, unpersuasive. We cannot accept the notion that a religious organization

---

functions of the church whether as separate corporations or otherwise. It is believed that the term 'church' should be all inclusive. [Fn. omitted.] To retain the phrase 'or a religious order' in this section of the bill will tend to limit the term and may lead to confusion in the interpretation of other provisions of the bill relating to a church, a convention or association of churches." (Sen. Rep. No. 1622 to accompany H. Res. No. 8300 (Pub.L. No. 591), 83d Cong., 2d Sess., p. 30 (1954).)

[13]Webster's Third New International Dictionary (1971) defines "sect" as an "organized ecclesiastical body" (p. 2052) and "denomination" as "a religious group or community of believers called by the same name" (p. 602). Even if we accept the premise, on the sparse evidence cited by the tax court, that Congress intended the term "church" to be synonymous with "sect" or "denomination," nothing in the preceding definitions excludes an assembly of believers in "universal Christian beliefs" (*Chapman* v. *Commissioner of Internal Revenue* (1967) 48 T.C. 358, 364) who are "interdenominational" in the sense that they seek to *transcend* established denominations and their doctrinal disputes.

[14]Young Life is exempt as a "church" in Oregon.

which proclaims Christianity, conducts services for the worship of the Christian God and provides for the administration of the Christian sacraments to its assembled members is not a church because it recognizes but refuses to enter the arena of sectarian strife, seeking instead to rise above it because of its belief that it is only the "acceptance of Christ" that matters. In *Maumee Valley Broadcasting Assn.* v. *Porterfield* (1972) 29 Ohio St.2d 95 [58 Ohio Ops.2d 192, 279 N.E.2d 863], a religious radio station was held to be a "church" despite its interdenominational makeup, the court observing that "a church of the type 'that finds with joy the grain of gold in every creed, and floods with light and love the germs of good in every soul' cannot reasonably be denied exempt status for that reason alone." (*Id.*, 279 N.E.2d at p. 866.)

In *Morey* v. *Riddell* (S.D.Cal. 1962) 205 F.Supp. 918, a federal district court determined (albeit in dicta) that an organization without a name, constitution, rules (other than those enunciated in the Bible), headquarters, or bank account was a "church." The court said: "These factors ... might normally be indicative of an absence of unity of purpose or operation. However, in the case of the church in question, they stem from the very doctrinal ties that bind its members together. The members of the church regard themselves simply as members of the body of Christ, that is, members of the body of persons following the teachings of Christ as revealed in the New Testament. They have refrained from adopting a denominational name and any written organizational guide supplementary to the New Testament because they believe that to do so would be to add an arbitrary gloss to biblical precepts, thus obscuring the word of God. Yet ... [m]any of them have worshiped and worked together for years in furtherance of the purposes of the church. They hold regular public meetings in homes and rented quarters for Bible study, worship and evangelism. They assemble together at 'camp meetings.' ... They recognize specific individuals as ministers and as church officers, from whom they accept guidance .... Thus, while the church lacks some of the common indicia of organization, it plainly is an organized association of persons dedicated to religious purposes." (*Morey* v. *Riddell, supra*, 205 F.Supp. at pp. 919-920.)

Since there is obvious danger in any attempt to prescribe the liturgy or incidents of worship of a "church," we conclude that the use of camping activities to "provide an atmosphere ... to promote the religious experience" which the organization seeks to foster is not

inconsistent with "church" status. The same reasoning applies to Young Life's recreational activities.

We have another, more fundamental difficulty with the director's "definition." It attempts conclusively to define "church," to provide an axiomatic test of the necessary and sufficient conditions for its application. Such an attempt is doomed to constitutional failure. Acceptance of the forms and practices of orthodox churches, as *exclusive* norms, inevitably leads to the exclusion of less established, less orthodox organizations which fulfill the same "church" functions in the lives of their members as such organizations and the preclusion of new religious forms. (*Fellowship of Humanity* v. *Co. Alameda* (1957) 153 Cal.App. 2d 673, 698 [315 P.2d 394]; cf. *United States* v. *Seeger* (1965) 380 U.S. 163, 184 [13 L.Ed.2d 733, 747, 85 S.Ct. 850] [draft exemption]; *Welsh* v. *United States* (1970) 398 U.S. 333, 340 [26 L.Ed.2d 308, 319, 90 S.Ct. 1792] [same].) The point was impliedly made in *St. Martin Evangelical Lutheran Church* v. *South Dakota, supra*, 451 U.S. 772, where, in holding that the term "church" in the federal exemption statute includes religious elementary and secondary schools with no separate legal existence from a church, the Supreme Court was careful to "disavow any intimations in this case *defining or limiting* what constitutes a church under FUTA or any other provision of the Internal Revenue Code." (Italics added.) (*Id.*, at p. 784, fn. 15 [68 L.Ed.2d at p. 621].)

Nevertheless, since "church[es]" are exempted from unemployment insurance taxes, determinations whether an organization is a "church" will necessarily be made, despite the difficulties of interpretation. The IRS has adopted a useful approach to such determinations, an approach which is at odds with director's preemptive definition. Rather than defining "church," the IRS admits its inability to formulate a definition, and applies criteria derived from the forms and practices observed in recognized churches,[15] without giving controlling weight to any. (Kurtz, *Difficult Definitional Problems in Tax Administration: Religion and*

---

[15]They are: "(1) a distinct legal existence, (2) a recognized creed and form of worship, (3) a definite and distinct ecclesiastical government, (4) a formal code of doctrine and discipline, (5) a distinct religious history, (6) a membership not associated with any other church or denomination, (7) a complete organization of ordained ministers ministering to their congregations, (8) ordained ministers selected after completing prescribed courses of study, (9) a literature of its own, (10) established places of worship, (11) regular congregations, (12) regular religious services, (13) Sunday schools for the religious instructions of the young, (14) schools for the preparation of its ministers."

*Race* (1978) 23 Cath. Law. 301, 304 [from an address delivered by Practicing Law Institute Seventh Biennial Conf., Tax Planning for Foundations, Tax-Exempt Status and Charitable Contribution, New York City, Jan. 9, 1978].) At the same time, in implementing the congressional policy of deferential treatment of "church[es]," the IRS recognizes that "few, if any, religious organizations—conventional or unconventional—satisfy all of these criteria,"[16] and it is sensitive to concerns that a stringent application of the criteria may discourage or even destroy new religious or new churches.[17] (See Kurtz, *supra*, 23 Cath. Law. at pp. 304-305.) While this approach has all the uniformity of a Whitman's Sampler, it does not embitter the constitutional palate.

The "functional" approach taken by the trial court comports with the one we have indorsed. The court determined that, as regards their purposes, their use of the Bible, promulgation of a creed or doctrine and the conduct of worship, taxpayers performed "church functions." We

---

[16]Criteria here operate as terms of assessment. They govern the determination whether something is or is not the case. They precede but measure the fact. (See generally, Cavell, The Claim of Reason (1979) Criteria and Judgment, ch. I, pp. 3-36.)

[17]A similar approach to the meaning of "religion" was recently taken in an illuminating law review note: "Religion can be described and exemplified in ways that disclose 'a complicated network of similarities overlapping and criss crossing.'[18] Unravelled, the various strands do not amount to 'religion' for the meaning of the network resides in the interweaving itself.[19] Thus, it is exemplary and not exhaustive to say that religion involves traditional theistic beliefs, or belief in something parallel to an orthodox conception of God, or an ultimate concern, or a set of beliefs that 'address themselves to basic questions about the nature of reality and the meaning of human existence.' A non-analytic understanding of religion is not boundless, for the network of similarities always includes a binding of the individual to something unrelated to individuality, through the intense operation of faith. No one element or set of elements constitutes a necessary and sufficient condition for religion; presence or absence of an element can neither establish a religion, nor prevent a belief from becoming a religion." [Fns. omitted.] (Note, *"Mind Control" or Intensity of Faith: The Constitutional Protection of Religious Beliefs* (1978) 13 Harv.Civ.Rights—Civ.Lib.L.Rev. 751, 760-761.)

[18]"(L. Wittgenstein, Philosophical Investigations ¶ 66 (3d ed. G. Anscombe trans. 1958). Wittgenstein characterizes the similarities as 'family resemblances,' *id.* 67, that combine into models or paradigms of what one attempts to define but do not break down into a set of discrete conditions. *See generally id.* 1-77. Wittgenstein articulated his ideas in connection with an attempt to define and explain 'language.'" (Note, 13 Harv.Civ.Rights—Civ.Lib.L.Rev., *supra*, at p. 760, fn. 47.)

[19]"In applying his concept of family resemblances to the common understanding of 'number,' Wittgenstein analogized to the process of spinning a thread. '[T]he strength of the thread does not reside in the fact that some one fibre runs through its whole length, but in the overlapping of many fibres.' *Id.* ¶ 67. This type of definition avoids the objection that the formulation of any definition of religion might violate religious freedom insofar as it dictated what a religion might be. [Citation.] A family-resemblances definition does not dictate any necessary elements." (Note, 13 Harv.Civ.Rights—Civ.Lib.L.Rev., *supra*, at pp. 760-761, fn. 48.)

will not disturb the trial court's determination in either case, since each is supported by ample evidence and each is well within the statutory meaning of "church."

The judgments are affirmed.

Paras, Acting P. J., and Reynoso, J., concurred.

A petition for a rehearing was denied August 28, 1981, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied October 14, 1981.