**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Christian Voice of Cent. Ohio v. Testa,* **Slip Opinion No. 2016-Ohio-1527.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1527

CHRISTIAN VOICE OF CENTRAL OHIO, APPELLANT, *v.* TESTA, TAX COMMR., ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Christian Voice of Cent. Ohio v. Testa,* **Slip Opinion No. 2016-Ohio-1527.]**

*Real-property taxation—Exemption for houses of public worship under R.C. 5709.07(A)(2)—Exemption allowed for property used to operate Christian radio station because primary use of property is for public worship— Decision of Board of Tax Appeals reversed.*

(No. 2014-1626—Submitted October 14, 2015—Decided April 14, 2016.)

APPEAL from the Board of Tax Appeals, No. 2011-1446.

_____

**KENNEDY, J.**

{¶ 1} This is an appeal from a decision of the Board of Tax Appeals ("BTA") that affirmed the tax commissioner's denial in 2011 of an exemption for real property located in Gahanna from which appellant, Christian Voice of Central

Ohio, operates a radio station. Until 2007, Christian Voice operated the station from offices located in New Albany. In 1991, the tax commissioner had granted an exemption for that property, reasoning that it was being "used for church purposes * * * under R.C. 5709.07." In 2007, following the relocation of Christian Voice's offices to Gahanna, a complaint was filed challenging the continued exemption of Christian Voice's New Albany property. In a final determination issued in 2013, the tax commissioner denied the complaint, similarly reasoning that the property was "being used for church facilities."

{¶ 2} Meanwhile, in 2008, Christian Voice applied for the same exemption for its Gahanna property that its New Albany property had enjoyed for 17 years. According to the application, a building constructed on the Gahanna property contains "production studios used for the origination of certain religious programming, offices, assembly rooms and a chapel." Christian Voice again sought exemption under R.C. 5709.07(A)(2), which relieves "[h]ouses used exclusively for public worship" and attendant lands from taxation. On this occasion, the tax commissioner denied the exemption, finding "no evidence that people assemble to worship together on the subject property" and reasoning that the exemption applies only "where people gather to profess their faith or to observe and participate in religious rituals or ceremonies."

{¶ 3} On appeal from the BTA's affirmance of the tax commissioner's final determination, Christian Voice advances three arguments: the decision to deny the exemption is unreasonable and unlawful when the primary use of the property is for public worship; the decision to ignore a property owner's prior tax exemption violates the doctrine of collateral estoppel when no material facts or circumstances changed since the prior determination; and the decision to completely deny the exemption is unreasonable and unlawful because R.C. 5713.04 permits real property to be split into exempt and nonexempt parts if the part used in the exempt manner can be precisely delineated.

{¶ 4} We agree with Christian Voice's first argument—that the primary use of the property is for public worship—and therefore reverse the decision of the BTA. Because we conclude that the BTA should have allowed the exemption under R.C. 5709.07(A)(2), the public-worship exemption, for the entire property, regardless of past determinations, we do not examine the second and third arguments asserted by Christian Voice.

## FACTUAL BACKGROUND

{¶ 5} According to testimony presented at the BTA hearing on May 29, 2013, Christian Voice operates several[1] radio stations, including most prominently WCVO 104.9 FM, "The River." The property at issue was acquired in May 2007 to replace Christian Voice's prior New Albany offices.

{¶ 6} Christian Voice has had 501(c)(3) status since it was established in 1964. There are no stockholders. According to Christian Voice's 2008 exemption application, the Gahanna property is used to produce radio programming for the purpose of "furthering the gospel of Jesus Christ through Contemporary Christian Music and Preaching and Teaching radio programs."

{¶ 7} The property is a 2.184-acre parcel improved with a 16,783-square-foot building built in 1998. Diagrams furnished by Christian Voice to the tax commissioner show two floors plus a basement. The basement consists primarily of a meeting room, the first floor contains a chapel and offices for administrative and program staff, and the second floor contains additional offices.

{¶ 8} According to testimony and recent financial statements introduced at the BTA hearing, Christian Voice's primary sources of revenue are (1) funds received from underwriters in exchange for advertising and (2) donations. The former relates to the sale of airtime on The River. Bill Montgomery, The River's

---

[1] According to Christian Voice's 2008 exemption application, programming originating on the property at that time aired on nine radio stations. By the time of the BTA hearing in May 2013, Christian Voice was operating only three stations.

chief sales officer, testified that the sale of advertising is vital to the ministry of the station. Daniel Baughman, president and chief executive officer, testified that the station has "to generate that revenue ourselves. It takes money to do what we do to get the Gospel out there."

{¶ 9} The advertising is limited by Federal Communications Commission regulations to mentions of the supporting business' names and telephone numbers; advertisements may not state the prices of their services or products. Montgomery testified that the station does not air advertisements that promote alcohol, lotteries, casinos, or adult businesses such as nightclubs. Additionally, the content of advertising is monitored to ensure that it is appropriate for children to hear.

{¶ 10} About 95 percent of Christian Voice's programming consists of Christian music and 5 percent of "talk." Todd Stach, chief creative officer, described the music as "bible verses put to music," explaining that artists convert old hymns into contemporary songs. He also stated that most of the songs "encourag[e] a vertical relationship with God."

{¶ 11} The River's talk segments consist of pastoral programming. John Moriarty—the station's full-time pastor, known as Pastor John—records one-minute devotional spots with contact information, inviting listeners to contact him for prayer or support. The River's DJs also promote Pastor John's counseling services on the air. In addition, on Sunday mornings, The River airs a three-hour syndicated program called "Keep the Faith." Although it includes music, the program is, according to Baughman's testimony, as "close to preaching and teaching as you can be," helping listeners "get through life[']s struggles."

{¶ 12} Christian Voice's chapel features a collection of Christian books as well as stained-glass artwork depicting the life of Jesus Christ. Pastor John leads a prayer devotional with Christian Voice staff in the chapel every Monday, Tuesday, Thursday, and Friday morning to pray for intentions that listeners have submitted via Christian Voice's website. On Wednesdays, he holds a Bible study in the chapel

for the staff. In addition, the pastor of Epic Church, a church located nearby, utilizes the chapel for pastoral counseling. The River airs regular announcements informing listeners that the chapel is open to them daily for private prayer.

{¶ 13} Christian Voice's basement meeting room is used regularly by groups and organizations with a religious focus, regardless of denomination. Epic Church uses the meeting room for several regular worship services, including a Sunday evening discipleship service, a Wednesday youth service, and a monthly service for the church's leadership team. Alpha, a group described as an introduction to the Christian faith, also utilizes the meeting room. Boy Scout meetings are also held in this space. Christian Voice does not charge any of these organizations for their use of its chapel or meeting room.

{¶ 14} The River is active in community outreach. Pastor John testified that part of The River's ministry is doing work for the homeless—for example, by coordinating groups of volunteers at local food pantries. DJ Mary Harris testified that her off-air duties involve community outreach with various nonprofit organizations and individuals in need. She shared stories of locating a refrigerator and delivering it to a listener's friend, collecting donations for a schoolteacher whose students needed clothes and shoes and delivering supplies to them, and collecting items for a family whose home had been destroyed by a fire. She also discussed the station's involvement with an organization that assists women recovering from sexual trauma and drug addiction. David Baker, The River's chief administrative finance officer, discussed the station's material assistance to local crisis-pregnancy centers.

## PROCEDURAL HISTORY

{¶ 15} Christian Voice filed its application for exemption for tax year 2008 on June 17, 2008. After the filing and the submission of requested supplemental information, the tax commissioner issued his determination on May 18, 2011. The commissioner cited BTA decisions holding that radio stations that broadcast

religious programming do not equate to "[h]ouses used exclusively for public worship" under R.C. 5709.07(A)(2). He also found that there was "no evidence that people assemble to worship together on the subject property used exclusively as a radio station." The commissioner denied the exemption claim, and Christian Voice appealed to the BTA.

{¶ 16} The BTA held a hearing at which Christian Voice presented ten witnesses and six exhibits, and the tax commissioner offered no witnesses and introduced exhibits consisting mostly of financial statements and tax filings.

{¶ 17} The BTA issued its decision on August 22, 2014. The BTA acknowledged Christian Voice's reliance on *World Evangelistic Ent. Corp. v. Tracy*, 96 Ohio App.3d 78, 644 N.E.2d 678 (2d Dist.1994), but distinguished that case as involving a station that was supported fully by donations without "advertising/underwriting" and that featured preaching and religious teaching on the air. BTA No. 2011-1446, 2014 Ohio Tax LEXIS 3942, 7-10 (Aug. 22, 2014). Under the circumstances, the BTA concluded that "the activities that occur at the subject property do not rise to [the] level" of " 'the open and free celebration or observance of the rites and ordinances of a religious organization.' " *Id.* at 11-12, quoting *Faith Fellowship Ministries, Inc. v. Limbach,* 32 Ohio St.3d 432, 435, 513 N.E.2d 1340 (1987), and citing *Jimmy Swaggart Evangelistic Assn. v. Kinney*, 6th Dist. Wood No. WD-82-64, 1983 Ohio App. LEXIS 5732 (Mar. 18, 1983). The BTA therefore affirmed the commissioner's denial of the application.

{¶ 18} Christian Voice has appealed.

### ANALYSIS

*Standard of Review*

{¶ 19} In reviewing a BTA decision, this court considers whether the decision was "reasonable and lawful." R.C. 5717.04. Under this standard, we acknowledge that " '[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations,'

6

" we will affirm them. (Brackets sic.) *Satullo v. Wilkins,* 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995). On the other hand, we " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' " *Id.*, quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001).

**{¶ 20}** The dispute between Christian Voice and the tax commissioner concerns not the underlying facts but whether those undisputed facts indicate that the property and attendant lands are a "[h]ous[e] used exclusively for public worship" and thus entitled to the property-tax exemption under R.C. 5709.07(A)(2). Therefore, this appeal presents a question of law, *Brennaman v. R.M.I. Co.*, 70 Ohio St.3d 460, 466, 639 N.E.2d 425 (1994), and our review is not deferential but de novo, *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 9.

*Public-Worship Exemption*

**{¶ 21}** R.C. 5709.07(A)(2) exempts from real-property taxation "[h]ouses used exclusively for public worship, the books and furniture in them, and the ground attached to them that is not leased or otherwise used with a view to profit and that is necessary for their proper occupancy, use, and enjoyment."

**{¶ 22}** We have previously held that for purposes of R.C. 5709.07, " 'public worship' means the open and free celebration or observance of the rites and ordinances of a religious organization." *Faith Fellowship*, 32 Ohio St.3d at 435, 513 N.E.2d 1340. In *Faith Fellowship*, three justices agreed that the Ohio Constitution, the basis from which the exemption originates, "contemplate[s] that the worship be a celebration of a religious rite in an open and free place and not the everyday activities of an individual which express devotion to his or her God." *Id.* at 436. To qualify under the public-worship exemption of R.C. 5709.07, the real property "must be used in a principal, primary, and essential way to facilitate the

public worship." *Id.* at paragraph two of the syllabus. While Justice Lanzinger's dissenting opinion may not be able to accept that "exclusively" means "primarily," this is the interpretation of R.C. 5709.07 established by this court and applied for almost 30 years. *See also Full Gospel Apostolic Church v. Limbach*, 46 Ohio St.3d 195, 196, 546 N.E.2d 403 (1989); *Grace Cathedral, Inc. v. Testa*, 143 Ohio St.3d 212, 2015-Ohio-2067, 36 N.E.3d 136, ¶ 30. This interpretation is also applied by the tax commissioner and the BTA to determine whether property is exempt pursuant to R.C. 5709.07. *See Grace Cathedral, Inc. v. Testa*, BTA No. 2012-2168, 2014 Ohio Tax LEXIS 963, 4-5 (Feb. 12, 2014). Although Justice Lanzinger seeks to limit the application of the syllabus language in *Faith Fellowship* "to those auxiliary buildings or portions of buildings * * * when there existed a primary building used exclusively for public worship," dissenting opinion at ¶ 95, the holding is devoid of any such limiting language. Had the *Faith Fellowship* court intended "principal, primary, and essential" to apply only to the determination of whether auxiliary buildings or portions of buildings qualified for exemption pursuant to R.C. 5709.07, it could have easily added this qualifying language. But, it did not.

{¶ 23} Christian Voice relies on *World Evangelistic*, 96 Ohio App.3d 78, 644 N.E.2d 678, and the tax commissioner relies on *Jimmy Swaggart*, 6th Dist. Wood No. WD-82-64, in support of their respective positions. We conclude that neither decision adequately resolves the instant matter.

{¶ 24} Guidance for whether Christian Voice's Gahanna property qualifies under the public-worship exemption of R.C. 5709.07(A)(2) is instead found in *Maumee Valley Broadcasting Assn. v. Porterfield*, 29 Ohio St.2d 95, 279 N.E.2d 863 (1972). The Maumee Valley Broadcasting Association was a nonprofit religious corporation that owned land upon which a broadcasting studio and 120-person auditorium were located. The tax commissioner argued that Maumee was not entitled to an exemption from sales and use taxes under R.C. 5739.02 because

8

it was a radio station and not a "church" within the meaning of that statute. We disagreed and advanced a holistic approach to determining whether an organization qualifies as a church:

> With a view to substance, we are of the opinion that the [tax commissioner]'s isolation of the radio station from the total picture is unwarranted by the evidence in this case. The evidence amply shows that this facility merely implements the religious objectives of the organization. The character of any nonprofit corporation must be found in its motives, its charter, its purposes, its methods, and its operation. Here, the appellee, like most churches, has dedicated all its land and buildings to charity and religion, and the operation of the radio station is not alone sufficient to change the underlying foundation of the corporation. Within the scope of common understanding, the appellee has demonstrated by evidence the necessary attributes of a church.

*Id.* at 97-98. While *Maumee* involved sales and use taxes, its analysis is applicable to real-property-tax exemptions.

{¶ 25} After our decision in *Faith Fellowship*, the General Assembly amended R.C. 5709.07, adopting a definition of "church" that embodied our prior case law. *See* Am.S.B. No. 71, 117 Ohio Laws, Part I, 147, 148. That definition remains the same today: a "church" is "a fellowship of believers, congregation, society, corporation, convention, or association that is formed primarily or exclusively for religious purposes and that is not formed for the private profit of any person." R.C. 5709.07(D)(1). In enacting this definition, effective after *Faith Fellowship*, the General Assembly recognized that in modern society, "public worship involves more than formal religious rites and ordinances." *Id.* at 438

(Locher, J., joined by Wright and Brown, JJ., concurring and dissenting in part). As Justice Locher stated, "[t]he life style of the people of Ohio has changed a great deal over the years, and the nature of public worship has changed with it. Formal church services today constitute only a portion of the worship experience, which now encompasses religious retreats, camps, athletics, and other social and recreational activities." *Id.* at 438-439.

{¶ 26} As a church is but one type of house of public worship, the definition of church in R.C. 5709.07(D)(1) and the related case law must be considered when determining whether Christian Voice qualifies under the public-worship exemption of R.C. 5709.07(A)(2). To find that an organization embodies the attributes of a church sufficiently to satisfy R.C. 5709.07(D)(1) but to conclude that that organization does not operate as a "[h]ous[e] used exclusively for public worship" for purposes of R.C. 5709.07(A)(2) is incongruous.

{¶ 27} Christian Voice is a corporation with 501(c)(3) status that conducts nondenominational religious activities through its broadcasts and on its premises. Devotional spots are aired throughout the day on The River, and a three-hour program that preaches a Christian message of hope and encouragement is broadcasted on Sunday mornings. DJs inform listeners of the availability of pastoral counseling and that the chapel is open to the public for private prayer.

{¶ 28} The majority of Christian Voice's broadcasts on The River are devoted to contemporary Christian music. The fact that Christian music makes up the majority of the broadcasting strengthens, not weakens, Christian Voice's argument that its purpose is religious. "[M]usic is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred. [It] is an integral part of many different religious traditions." *Equal Emp. Opportunity Comm. v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 802 (4th Cir.2000). "[T]he inspirational appeal of religion in the * * * guis[e] [of music] is often stronger than in forthright sermon." *Illinois ex rel. McCollum v. School Dist. No.*

10

*71 Board of Edn.*, 333 U.S. 203, 236, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Jackson, J., concurring).

**{¶ 29}** Christian Voice employs Pastor John as a full-time minister. He and other Christian Voice staff members gather on a regular basis in the on-site chapel to pray for intentions that listeners have submitted. He also leads Bible study on a weekly basis in the chapel, and counseling services are available there to anyone who is in need.

**{¶ 30}** Christian Voice is also active in the community, performing acts of charity. It partners with a number of charitable organizations to provide assistance to the less fortunate. It also works directly with listeners who contact its station seeking assistance.

**{¶ 31}** Finally, Christian Voice provides its chapel and basement meeting room to the public regardless of denomination and without seeking compensation. The meeting room is used regularly by religious and charitable groups for worship services and religious discussion as well as for Boy Scout meetings.

**{¶ 32}** Christian Voice has presented evidence demonstrating that it is a corporation that was formed primarily or exclusively for religious purposes and not for the private profit of any person. *See* R.C. 5709.07(D)(1). Similar to Maumee Valley, Christian Voice "has dedicated all its land and buildings to charity and religion, and the operation of the radio station is not alone sufficient to change the underlying foundation of the corporation. * * * [It has] the necessary attributes of a church." *Maumee*, 29 Ohio St.2d at 98, 279 N.E.2d 863. Accordingly, it follows that Christian Voice operates as a "[h]ous[e] used exclusively for public worship" under R.C. 5709.07(A)(2).

**{¶ 33}** In previously exempting Christian Voice's New Albany property under R.C. 5709.07(A)(2), the tax commissioner relied upon the fact that Christian Voice has the attributes of a church. In 1991, the tax commissioner granted the exemption, "find[ing] that the real property * * * is used for *church purposes*."

(Emphasis added.) In 2013, almost two years after denying the exemption for the Gahanna parcel, the tax commissioner approved the continued exemption for the New Albany parcel, finding that that property "satisfies the requirements for exemption by reason of being used for *church facilities*." (Emphasis added.)

{¶ 34} Even if true, the tax commissioner's position that a physical assemblage of persons does not engage in worship activity on Christian Voice's Gahanna property would not preclude the conclusion that Christian Voice is a church within the meaning of the statute. R.C. 5709.07(D)(1) does not require a congregation or worship activity; instead, its concern is whether the organization has a primarily religious purpose and is not for profit. We have also rejected the requirement that an organization must have a united body of communicants to be a church when the organization exhibits the essential qualities of a church. *Maumee* at 98.

{¶ 35} Finally, the BTA stated in its decision that even if Christian Voice's broadcasts and other activities could be considered "public worship," the sale of on-air advertising is not public worship but part of a commercial radio enterprise's operations. The BTA's focus on the sale of advertising is without support in R.C. 5709.07, which prohibits exemption for property being used "with a view to profit," R.C. 5709.07(A)(2), (3), and (4), and for a church that was "formed for the private profit of any person," R.C. 5709.07(D)(1). Christian Voice is a nonprofit corporation that sells on-air advertising to continue its ministry. It was not formed for private profit and its property is not being used to generate a profit. To the contrary, the revenue that is generated is for the religious mission of the corporation. In this respect, Christian Voice is no different from a church that sells advertising on weekly bulletins or on banners at church functions to raise revenue that allows the church to continue its religious ministry. The BTA's position on revenue erodes the standing of traditional religious institutions as churches and houses of public worship.

**{¶ 36}** The Chief Justice's dissenting opinion contends that we "ignor[e] the well established rule in Ohio that 'it is the use of the property and not the use of the proceeds derived therefrom' that determines whether a tax exemption is conferred." Dissenting opinion at ¶ 77, quoting *Columbus Youth League v. Cty. Bd. of Revision*, 172 Ohio St. 156, 158, 174 N.E.2d 110 (1961). However, we have only applied this rule in the context of the charitable-use exemption under R.C. 5709.12—not the public-worship exemption under R.C. 5709.07(A)(2). The dissent's attempt to extrapolate this rule into the public-worship exemption lacks support in our case law. The Ohio cases referenced by the dissent are neither factually similar—none involved a Christian radio station that exhibited the attributes of a church—nor present the current legal issue—application of the public-worship exemption. *See Columbus Youth League*, 172 Ohio St. 156, 174 N.E.2d 110 (affirming denial of charitable-use exemption for baseball stadium owned by charitable institution and leased to professional baseball club because the property was not used exclusively, or even primarily, for charitable purposes); *Incorporated Trustees of Gospel Worker Soc. v. Evatt*, 140 Ohio St. 185, 188, 42 N.E.2d 900 (1942) (affirming denial of charitable-use exemption for the part of charitable institution's property that was used as living quarters for employees of religious printing and publishing establishment); *Lutheran Book Shop v. Bowers*, 164 Ohio St. 359, 361, 131 N.E.2d 219 (1955) (to qualify for charitable-use exemption under R.C. 5709.12, the test is the present use of the property rather than the ultimate use of proceeds received from the property); *Zindorf v. Otterbein Press*, 138 Ohio St. 287, 34 N.E.2d 748 (1941) (holding that not-for-profit publishing corporation's use of property was not exclusively for charitable purposes when more than 40 percent of total revenues came from commercial printing). Notably, there are no Ohio cases in which we have applied this rule in the context of R.C. 5709.07(A)(2). The Chief Justice's reliance in her dissent on out-of-state authorities is also unavailing as those decisions interpret Illinois and

Alaska statutes, each of which has different language from R.C. 5709.07(A)(2). *See* dissenting opinion at ¶ 78, citing *Three Angels Broadcasting Network, Inc. v. Dept. of Revenue*, 381 Ill.App.3d 679, 697, 885 N.E.2d 554 (2008), and *Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 879 (Alaska 1985).

{¶ 37} Moreover, our analysis focuses on the exclusive use of the property. In other words, we have considered how the property is primarily used. *See Grace Cathedral*, 143 Ohio St.3d 212, 2015-Ohio-2067, 36 N.E.3d 136, at ¶ 18 (resolution of an exemption claim pursuant to R.C. 5709.07(A)(2) focuses on whether the primary use of the property is public worship). As detailed above, the record clearly demonstrates that the primary use of Christian Voice's land and building is for church purposes. Accordingly, Christian Voice uses its property "exclusively for public worship" under R.C. 5709.07(A)(2).

{¶ 38} In reaching this conclusion, the Chief Justice's dissent accuses us of blatant activism. Dissenting opinion at ¶ 47. However, the charge of activism is misdirected and gratuitous as our conclusion gives entire effect to R.C. 5709.07(A)(2), is supported by relevant case law, and reaches the same conclusion that the tax commissioner reached in two separate final determinations issued 21 years apart, one of which was issued after the determination at issue in this appeal.

{¶ 39} The tax commissioner's failure to consider whether Christian Voice exhibits the essential qualities of a church in determining whether it is a "[h]ous[e] used exclusively for public worship" resulted in an overly narrow construction based on an incorrect legal conclusion. We agree with Christian Voice's first argument—namely, that the primary use of its property is for public worship. Because we allow the exemption under R.C. 5709.07(A)(2), we do not address Christian Voice's remaining arguments.

## CONCLUSION

{¶ 40} Christian Voice's Gahanna property qualifies for the property-tax exemption for "[h]ouses used exclusively for public worship" under R.C.

5709.07(A)(2). The decision of the BTA is reversed, and the exemption is allowed for tax year 2008 in accordance with the application filed in this case in that year.

Decision reversed.

PFEIFER, O'DONNELL, and FRENCH, JJ., concur.

O'CONNOR, C.J., dissents with an opinion that LANZINGER, J., joins.

LANZINGER, J., dissents with an opinion that O'NEILL, J., joins in part.

_____

**O'CONNOR, C.J., dissenting.**

**{¶ 41}** In this appeal, appellant, Christian Voice of Central Ohio, asserts that it established that its real property, which is located in Gahanna and serves primarily as a radio broadcast station, satisfies the "exclusive use" requirement to qualify for tax-exempt status for "[h]ouses used exclusively for public worship" under R.C. 5709.07(A)(2).

**{¶ 42}** The majority frames the issue before us as whether appellant's broadcast of "adult contemporary Christian" music mystically transforms its radio station into a tax-exempt house of worship. If that framing were proper, we would face a church-state issue that poses complex constitutional conundrums. *See Young Life Campaign v. Patino*, 122 Cal.App.3d 559, 565, 176 Cal.Rptr. 23 (1981). But the question before us is far more simple and mundane: Is appellant entitled to a tax exemption on real property that contains a radio broadcast station that produces millions of dollars in revenue? That question should be answered according to this state's law of taxation, which is meant to apply equally to all Ohioans.

**{¶ 43}** The principle underlying Ohio tax law is that all Ohioans must equally bear the burdens of taxation and, therefore, that all real property is subject to taxation except in the limited circumstances in which the General Assembly has granted tax exemptions. R.C. 5709.01; *Seven Hills Schools v. Kinney*, 28 Ohio St.3d 186, 503 N.E.2d 163 (1986); *Kroger Co. v. Schneider*, 9 Ohio St.2d 80, 83, 223 N.E.2d 606 (1967), citing *Exchange Bank of Columbus v. Hines*, 3 Ohio St. 1,

15 (1853). The property owner bears the burden of establishing entitlement to an exemption, which is conferred by statute, and exemption provisions are construed strictly to ensure fairness to all. *Natl. Tube Co. v. Glander*, 157 Ohio St. 407, 105 N.E.2d 648 (1952), paragraph two of the syllabus; *Cincinnati College v. State*, 19 Ohio 110, 115 (1850). In all doubtful cases, exemptions must be denied. *A. Schulman, Inc. v. Levin*, 116 Ohio St.3d 105, 2007-Ohio-5585, 876 N.E.2d 928, ¶ 7. These basic rules are designed to ensure that all Ohioans are burdened equally by taxation. *Lutheran Book Shop v. Bowers*, 164 Ohio St. 359, 362, 131 N.E.2d 219 (1955); *Watterson v. Halliday*, 77 Ohio St. 150, 171, 82 N.E. 962 (1907).

**{¶ 44}** Appellant seeks the statutory exemption provided to "[h]ouses used exclusively for public worship * * * and the ground attached to them that is not * * * used with a view to profit." R.C. 5709.07(A)(2).

**{¶ 45}** Based on a careful review of the record in this case, measured against our legal precedent, the Board of Tax Appeals found that the property in question is not tax-exempt as a house used exclusively for public worship. Instead, it concluded, quite unremarkably, that the property was used to operate a radio station and thus was not exempt under R.C. 5709.07(A)(2).

**{¶ 46}** Our task is a limited one: We are to review the BTA's decision and uphold it if it is reasonable and lawful. R.C. 5717.04; *Seven Hills Schools*, 28 Ohio St.3d at 186-187, 503 N.E.2d 163. In doing so, the law requires that "we indulge no presumption favorable to [tax] exemptions," *Incorporated Trustees of Gospel Worker Soc. v. Evatt*, 140 Ohio St. 185, 188, 42 N.E.2d 900 (1942), and demands that even if we are sympathetic to "appellant's desire to acquire tax exempt status for a radio station which provides inspiration to so many," we may not "create new categories for tax exemption; that is the job more properly left to the legislature," *Jimmy Swaggart Evangelistic Assn. v. Kinney*, 6th Dist. Wood No. WD-82-64, 1983 Ohio App. LEXIS 5732, 6 (Mar. 18, 1983).

{¶ 47} Nevertheless, the majority here announces a new and overly broad interpretation of the exemption provision in R.C. 5709.07(A)(2), with an analysis that hints at dispensation for perceived religious freedoms, majority opinion at ¶ 35-36, but which is ultimately based on inapposite case law flown in on a wing and a prayer. I dissent from that blatant activism, which reaches a result favorable to this appellant, to the burden of every other Ohio taxpayer.

{¶ 48} I would hold that the tax commissioner properly denied tax-exempt status under R.C. 5709.07(A)(2). I would also deny on the merits appellant's argument based on collateral estoppel and reject as waived appellant's partial-exemption claim.

## ANALYSIS

### *Appellant*

{¶ 49} Let us first consider appellant.

{¶ 50} Appellant operates on a multimillion-dollar annual budget.

{¶ 51} The property for which it seeks a tax exemption includes a building that encompasses nearly 17,000 square feet and contains "production studios used for the origination of certain religious programming, offices, assembly rooms and a chapel." The religious programming offered by appellant is almost entirely "adult contemporary Christian" music that appellant obtains from music-industry sources and monitors carefully for ratings. Appellant does not broadcast prayer or church services. Other than music (and advertisements), listeners are offered only a 60-second devotional "spot," which is run "cyclically throughout the day," and appellant's DJs' attempts to "shar[e] their lives spiritually" on the air.

{¶ 52} The chapel occupies a minute portion of the facility, a 25-by-15-foot room, which is approximately 375 square feet—two percent of the total square footage of the structure. Although appellant's listeners are invited to use the chapel, there are no regular worship services in it, and its use by those seeking religious guidance is rare. Indeed, appellant has conceded that the use of the chapel is de

minimis. And although the majority makes a point of noting the work of "Pastor John," a minister and DJ employed by appellant, there is absolutely nothing in the record establishing that he uses the chapel to lead religious services for the public.

{¶ 53} Appellant emphasizes that a meeting room in the basement is open to churches and other organizations for use, free of charge. For example, a local church uses the room for a weekly youth-group meeting and for Sunday evening services. But the record is devoid of any showing that other groups use the building for religious purposes. In fact, many of those who visit, including members of the Boy Scouts of America and children who are home-schooled, tour the building for educational purposes rather than for religious ones.

{¶ 54} To the extent that appellant has a flock, that flock is its on-air audience, which includes those who tune in from their homes, motor vehicles, or workplaces. Though the flock numbers about a quarter of a million people, the great majority of appellant's income—about two-thirds—is derived from advertising revenue and the rental of appellant's broadcasting towers.[2] It is not a bad business, evidently; appellant secures approximately two million dollars in annual revenue from the advertisements that it broadcasts between the faith-based songs on its playlist.

{¶ 55} Appellant nevertheless asserts that its use of the property is for the purpose of "furthering the gospel of Jesus Christ through Contemporary Christian Music and Preaching and Teaching radio programs." The chief sales officer of the broadcasting corporation contends that the sale of advertising is "vital to the furtherance of the ministry of the radio station." And appellant's chief executive officer explains, "It takes money to do what we do to get the Gospel out there."

---

[2] Listeners apparently contribute about one-third of appellant's income. Appellant also allows a local church to use the property twice weekly for services. Although appellant does not charge that church for rent, the church makes weekly contributions to appellant.

18

**{¶ 56}** As far as economic principles go, those statements may be truthful. But they neither equate with the law of taxation, nor are they unassailable religious principles. Quite the contrary. Even assuming that appellant's programming is "bible verses put to music," majority opinion at ¶ 10, appellant is not unique in that regard. As the majority admits, music is integral to many religious traditions. *Id.* at ¶ 28, citing *Equal Emp. Opportunity Comm. v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 802 (4th Cir.2000).

**{¶ 57}** References to music, including singing and the use of musical instruments, appear throughout the Bible. *See, e.g.*, Isaiah 12:5; Psalms 9:2, 11; 1 Chronicles 13:8. And references to the Bible and other religious texts are often the bases of great works by musical artists, even those considered outside the contemporary Christian music genre. Consider, for example, Pete Seeger's *Turn! Turn! Turn! (To Everything There Is A Season)*, which was made famous by The Byrds in the 1960s but is, essentially, a restatement of the Book of Ecclesiastes. Cohn, *The Byrds' Turn! Turn! Turn! TURNS 50* (Dec. 4, 2015), http://www.biography.com/news/the-byrds-turn-turn-turn-facts-anniversary (accessed Mar. 4, 2016). Similarly, other great musicians have found comfort, solace, and faith in music they created based on their own interpretations of religious texts,[3] as Andrew Lloyd Webber did with *Joseph and the Amazing Technicolor Dreamcoat* and *Jesus Christ Superstar*. *See* Coulson, *They're Playing Our Song! The Promise and the Perils of Music Copyright Litigation*, 13 J. Marshall Rev. Intell. Prop. L. 555, 563 (2014); http://www.jesuschristsuperstar.com/about/

---

[3] The majority relies, in part, on Justice Jackson's concurring opinion in *McCollum*, which forbade the states from utilizing tax-supported public school systems "in aid of religious instruction," *Illinois ex rel. McCollum v. School Dist. No. 71 Bd. of Edn.*, 333 U.S. 203, 204-205, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Properly understood, Justice Jackson's opinion recognized that many subjects taught in schools, not just music, could carry "the inspirational appeal of religion." *Id.* at 235-236 (Jackson, J., concurring).

(accessed Mar. 4, 2016). And who could argue that Handel's *Messiah* is not one of the world's greatest pieces of music inspired by religious teachings?

{¶ 58} But as both Christians and taxpayers will recognize and understand, the mere fact that those songs are transmitted over radio airwaves does not transmogrify the broadcaster into a tax-exempt house of worship under the Revised Code any more than a television or cable station comes closer to tax-exemption eligibility every time it airs a religiously inspired song or movie. And the mere fact that one might receive the broadcast in his home or even spend a portion of his week humming, whistling, or singing some of the great hymns or "bible verses set to music" does not transform one's abode or vehicle into a tax-exempt house of worship.

### *The Majority's Opinion*

**The majority uses incorrect standards of review and inapposite law**

{¶ 59} To carve out an improper tax exemption here, the majority chooses to ignore legislation and the law on church taxation cited by the parties and instead relies on inapposite law, *Maumee Valley Broadcasting Assn. v. Porterfield*, 29 Ohio St.2d 95, 279 N.E.2d 863 (1972).

{¶ 60} *Maumee Valley* presented a discrete question: whether a nonprofit religious corporation was a tax-exempt "church" within the meaning of Ohio's *sales-tax statute*, R.C. 5739.02(B)(12). Contrary to the majority's suggestion that *Maumee Valley* provides guidance here, that summary decision offers little to assist us in determining whether appellant is a "[h]ous[e] used exclusively for public worship" under R.C. 5709.07(A)(2). And to the extent that *Maumee Valley* has any import here, it is of no help to appellant. To the contrary, *Maumee Valley* supports the tax commissioner's determination.

{¶ 61} At the outset, it is important to recognize that *Maumee Valley* clearly mandates a different standard of review than that used by the majority. *Maumee Valley* holds that the determination of whether an organization is a church is a

*factual* determination, not a legal one. *Id.* at 98 (describing the "factual determination" of the Board of Tax Appeals in deciding whether the corporation was a church for purposes of the sales-tax statute). The majority ignores that part of the holding, which it must do in order to employ de novo review rather than the deferential review that should apply—and that would require our affirmance of the tax commissioner's decision in this case. *See Seven Hills Schools*, 28 Ohio St.3d at 186-187, 503 N.E.2d 163. The court's decision today, however, ignores but does not change our clear precedent that " '[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations,' " we will affirm them. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995). When engaging in appellate review of tax decisions, every member of the court should remember the commandment that we do not intrude on determinations that are sound and supported by the record.

> It is not our province to be a "super board" and thereby render a different decision because we have interpreted the facts differently than has the board. While we have the ultimate authority, we should always remember that we are not final because we are infallible—we are only infallible *because* we are final.

(Emphasis sic.) *Faith Fellowship Ministries, Inc. v. Limbach*, 32 Ohio St.3d 432, 439-440, 513 N.E.2d 1340 (1987) (Douglas, J., concurring in part and dissenting in part).

{¶ 62} Even assuming that the majority could find some way around the standard of review, the facts and law make *Maumee Valley* inapplicable here.

{¶ 63} The majority's analysis of *Maumee Valley* omits two critical facts: *Maumee Valley* involved a nonprofit religious organization that conducted church services on its premises for members of the public, and the organization's only source of revenue was "donations, gifts, and contributions." *Id.* at 95-97. In fact, about 80 percent of the organization's gross receipts came from approximately 500 people called "faith partners," who contributed financial support on a monthly basis. *Id.* at 96-97. With the millions in advertising revenue that it secures, appellant is, of course, quite different from the organization in *Maumee Valley* and quite different from the many traditional churches that receive modest revenue from advertising in their weekly bulletins or on banners at church functions. *See* majority opinion at ¶ 32.

{¶ 64} Even if the cases were not distinguishable on the facts, they would remain distinguishable on the law because the organization in *Maumee Valley* and the radio station here rely on different exemptions from different taxes.

{¶ 65} The syllabus in *Maumee Valley* is limited expressly to R.C. 5739.02(B)(12)—a statute not at issue here. For this reason, the BTA found appellant's reliance on *Maumee Valley* to be misplaced because the standards applicable there are not applicable to the exemption for "[h]ouses used exclusively for public worship."

{¶ 66} Moreover, although *Maumee Valley* states that a nonprofit religious corporation may not be denied tax-exempt status "for the reason that it operates a radio facility in conjunction with and in furtherance of its religious and charitable activities," *id.* at syllabus, it does not say that the taxing authorities—or this court—must grant an exemption to a radio facility. Its holding is of no import here.

{¶ 67} Properly understood, *Maumee Valley* stands for the proposition that a nondenominational church, which was relatively uncommon in 1972,[4] is eligible

---

[4] The percentage of Protestants claiming "no denomination or non-denominational" rose from roughly four percent in the 1970s to 15 percent in 2006. Thumma, *A Report on the 2010 National*

for exemption on the same grounds as a more traditional house of worship.[5]   The majority in *Maumee Valley* clarified that even if a nonprofit religious corporation "is not without some unique features" and "cannot, in a traditional sense, claim a certain congregation," it can be considered a church under R.C. 5739.02(B)(12). 29 Ohio St.2d at 98, 279 N.E.2d 863.

{¶ 68} Indeed, the opinion pointedly states, albeit without proper attribution to the great 19th-century agnostic orator Robert Green Ingersoll, that it was referring to nondenominational churches:  "In other words, a church of the type 'that finds with joy the grain of gold in every creed, and floods with light and love the germs of good in every soul' cannot reasonably be denied exempt status for that reason alone." *Id.*

{¶ 69} In any event, the fact that appellant is nondenominational is not an issue in this case and plays no role in the legal analysis of its tax liability.  Thus, *Maumee Valley* is neither applicable nor compellingly illustrative on either fact or law.  And to the extent that *Maumee Valley* has any proper application here, the majority ignores it.

{¶ 70} But those are not the only analytical sins committed by the majority. **The majority incorrectly concludes that appellant's property is used exclusively for public worship**

{¶ 71} The majority's effort to bless appellant with a tax exemption purportedly relies on this court's lead opinion in *Faith Fellowship Ministries*, 32

---

*Profile     of     U.S.     Nondenominational     and     Independent     Churches*, http://www.hartfordinstitute.org/cong/nondenominational-churches-national-profile-2010.html (accessed Mar. 10, 2016), citing National Opinion Research Center, The General Social Survey, http://gss.norc.org/, and Bader et al., *The Ties that Bind: Network Overlap among Independent Congregations*, 30 Social Science Computer Rev. 259 (2012).

[5] At that time, there appears to have been some debate in the courts over whether nondenominational churches were constitutionally exempt from taxation.  *See, e.g.*, *Young Life Campaign*, 122 Cal.App.3d at 571-572, 176 Cal.Rptr. 23, citing *Vic Coburn Evangelistic Assn. v. Emp. Div.*, 35 Or.App. 655, 582 P.2d 51 (1978), and *Chapman v. Commr. of Internal Revenue*, 48 T.C. 358 (1967).

Ohio St.3d 432, 513 N.E.2d 1340.  It bears mention, however, that in that case, three justices would have gone so far as to exempt from taxation, along with an applicant's sanctuary, its cafeteria, gymnasium, swimming pool, "playfield," and nature trails.  *Id.* at 439 (Locher, J., joined by Wright and Brown, JJ., concurring in part and dissenting in part).  But common sense prevailed, and four justices rejected that overly generous view of the exemption, *id.* at 437 (lead opinion); *id.* at 439 (Douglas, J., concurring in part and dissenting in part), holding that only the portions of property that are used in a principal, primary, and essential way to facilitate public worship are exempt from real estate taxes, *id.* at paragraph two of the syllabus.  *See also Christ Church Pentecostal v. Tennessee State Bd. of Equalization*, 428 S.W.3d 800, 808, 814 (Tenn.Ct.App.2013) (affirming the denial of a property-tax exemption for a bookstore café operated by a church, in part for outreach efforts).

{¶ 72} Properly understood, the holding in *Faith Fellowship* stands for the proposition that public worship means the "open and free celebration or observance of the rites and ordinances of a religious organization."  *Id.* at paragraph one of the syllabus.  As Chief Justice Moyer explained in *Faith Fellowship*, public worship must be public:

> The everyday expression of one's relationship with a supernatural power may be considered by that individual as worship.  This court certainly does not intend to discourage such activity.  However, *the Constitution, which incorporates the exemption, and the statute, by which it is established, contemplate that the worship be a celebration of a religious rite in an open and free place and not the everyday activities of an individual which express devotion to his or her God.*

24

(Emphasis added.) *Id.* at 436 (lead opinion).

{¶ 73} The majority's suggestion here that the General Assembly amended the statute in the wake of *Faith Fellowship* in order to make the statute applicable to radio broadcast listeners is not an accurate understanding of the decision or the amendment. It simply evidences the majority's attempt to impose its logic on a statutory scheme and to create an unlimited tax exemption beyond the scope of the express statutory language. *See Clayton v. Ohio Bd. of Nursing*, __ Ohio St.3d __, 2016-Ohio-643, __ N.E.3d __, ¶ 46 (Kennedy, J., dissenting).

{¶ 74} The amendment made clear that a "church" can be any number of believers that formed primarily or exclusively for a religious purpose and who did not form for the private profit of any person. R.C. 5709.07(D)(1). Even assuming that the majority is correct in that the legislature intended to expand the definition of a "[h]ous[e] used exclusively for public worship" to mean more than a physical structure, *see, e.g.*, *World Evangelistic Ent. Corp. v. Tracy*, 96 Ohio App.3d 78, 83, 644 N.E.2d 678 (2d Dist.1994),[6] nothing in any of the General Assembly's amendments to R.C. 5709.07 shows that the legislature intended to alter the fundamental premise of *Faith Fellowship*, i.e., the necessity of *public* worship. And even if we assume that listening to music is worship, nothing in the record before us establishes that appellant's property is used exclusively for *public* worship. "For

---

[6] As the Second District Court of Appeals explained:

> A "house used exclusively for public worship," as used in R.C. 5709.07, must accommodate a structure or facility that is used exclusively or primarily to propagate a religious message to persons who receive that message for a worshipful purpose. Those who engage in that activity constitute a form of religious society, whether they are gathered where the religious message originates or are dispersed elsewhere.

Thus, there is some nonbinding precedent for the notion that a broadcasting corporation can be a "[h]ous[e] used exclusively for public worship" for purposes of R.C. 5709.07(A)(12). Notably, however, the World Evangelistic Enterprise Corporation was fully supported by listener donations and the contributions of churches and radio-program producers, rather than by advertising revenue. *World Evangelistic Ent.* at 79-80.

the purposes of [R.C. 5709.07(A)(2),] 'public worship' means the open and free celebration or observance of the rites and ordinances of a religious organization; *it does not include everyday activities that express devotion to God.*"  (Emphasis added.)  86 Ohio Jurisprudence 3d, Taxation, Section 539, at 650 (2009).

{¶ 75} And, even if we assume appellant had adduced sufficient evidence that it is a house of public worship, it is still unable to establish that the exemption is proper.

{¶ 76} Appellant is a radio station.  The fact that it broadcasts religious songs or does charitable deeds does not change that fact.  Even if bears the indicia of incidental aspects of a ministry, it is not entitled to an exemption because it is not used exclusively for public worship.  *See, e.g.*, *Watterson*, 77 Ohio St. at 173, 82 N.E. 962.

{¶ 77} The statutory term "exclusive" means just that—exclusive.  Here, even accepting the argument that appellant uses its programming to evangelize, it admittedly also uses its radio stations to generate income.  The majority makes much of the fact that appellant's purported use of that income is not for profit but for the benefit of the station's charitable and religious works.  But in doing so, the majority ignores the well established rule in Ohio that "it is the use of the property and not the use of the proceeds derived therefrom" that determines whether a tax exemption is conferred.  *Columbus Youth League v. Cty. Bd. of Revision*, 172 Ohio St. 156, 158, 174 N.E.2d 110 (1961).  "Any right of exemption is lost if the property is used to produce income, regardless of the fact that the income is exclusively used for a purpose that is of such a nature that if the property itself, rather than its income, were so used the property would be exempt."  86 Ohio Jurisprudence 3d, Taxation, Section 539, at 649-650 (2009), citing *Incorporated Trustees of Gospel Worker Soc.*, 140 Ohio St. 185, 42 N.E.2d 900.  "[T]he test is the present use of the property rather than the ultimate use of [the] proceeds," *Gospel Worker Soc.* at paragraph

two of the syllabus, even when the owner of the property is a not-for-profit corporation organized for charitable purposes:

> "Where a substantial portion of the gross income of a corporation is received for work done in competition with commercial concerns in the same line, the property of such corporation may not be exempted from taxation under Section 5353, General Code [Section 5709.12, Revised Code], even though such corporation be one formed not for profit and owned by a religious institution, for whose use, benefit and behoof the property of the corporation is held."

(Brackets sic.) *Lutheran Book Shop*, 164 Ohio St. at 361-362, 131 N.E.2d 219, quoting *Zindorf v. Otterbein Press*, 138 Ohio St. 287, 34 N.E.2d 748 (1941), paragraph two of the syllabus.

{¶ 78} " 'When money is made by the use of [a] building, that is profit, no matter to what purpose that money is applied.' " (Brackets sic.) *Three Angels Broadcasting Network, Inc. v. Dept. of Revenue*, 381 Ill.App.3d 679, 697, 885 N.E.2d 554 (2008), quoting *People ex rel. Baldwin v. Jessamine Withers Home*, 312 Ill. 136, 141, 143 N.E. 414 (1924). "Thus, property used by a charitable organization to raise money for that group's charitable activities is not exempt since the property's direct and primary use is fund-raising and not charity itself." *Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 879 (Alaska 1985).

{¶ 79} Having concluded that appellant fails to establish that the BTA's decision is not entitled to our deference or even to show that the property in question is a house of worship used exclusively for public worship, I would affirm the BTA's decision. I therefore address two other points raised by appellant in its appeal to this court but not addressed by the majority.

**The tax commissioner was not collaterally estopped from denying the exemption**

**{¶ 80}** Appellant asserts that the tax commissioner was collaterally estopped from denying it the exemption because it previously conferred one to appellant in 1991.

**{¶ 81}** This court has acknowledged "a narrow range of applicability for the doctrine of collateral estoppel in tax proceedings." *Olmsted Falls Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597, ¶ 17. The doctrine " 'precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action.' " *Progressive Plastics, Inc. v. Testa*, 133 Ohio St.3d 490, 2012-Ohio-4759, 979 N.E.2d 280, ¶ 17, quoting *Whitehead v. Gen. Tel. Co.*, 20 Ohio St.2d 108, 112, 254 N.E.2d 10 (1969), *overruled on other grounds*, *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 653 N.E.2d 226 (1995). *Accord Am. Soc. for Metals v. Limbach*, 59 Ohio St.3d 38, 39, 569 N.E.2d 1065 (1991) (identifying as "basic elements" of collateral estoppel "(1) an administrative proceeding of a judicial nature, (2) an identity of the parties, and (3) an identity of the issues"). Appellant's assertion of collateral estoppel fails at the most basic level: there was no previous administrative proceeding *of a judicial nature*, and the issue here was not actually and necessarily litigated previously.

**{¶ 82}** Appellant relies on a 1991 final determination of the tax commissioner granting appellant the exemption at a former address, but that proceeding before the tax commissioner was the initial process by which the administrative determination of taxable status occurs. Thus, in no sense is the final determination in 1991 a "judgment" rendered after issues were litigated between contending parties.

**{¶ 83}** Moreover, the 1991 decision determined that the exemption was justified, so there was no need to litigate. Nor does the record establish that any litigation ensued.

**{¶ 84}** The same is true of the more recent determination by the tax commissioner regarding the taxable status of part of the same property that appellant previously owned. There can be no requisite "identity of issues" because the current exemption claim involves a different parcel in a different tax year. *See Hubbard Press v. Tracy*, 67 Ohio St.3d 564, 565, 621 N.E.3d 396 (1993) (collateral estoppel did not apply despite continuous exemption of printing house associated with Presbyterian Church from 1950 until its return to the taxable list in 1983 because 1983 was a different year, hence a different issue). Thus, appellant's collateral estoppel argument fails.

### Appellant is barred from arguing for a "split-listing" because it did not raise that claim in its notice of appeal to the BTA

**{¶ 85}** Former R.C. 5717.02 required that a notice of appeal to the BTA from a determination of the tax commissioner have a copy of the determination attached and "specify the errors therein complained of." 2011 Sub.H.B. No. 225.[7] It is well settled that "the BTA lacks jurisdiction to grant relief from a final determination based on * * * alleged errors that were not sufficiently specified in the notice of appeal." *Brown v. Levin*, 119 Ohio St.3d 335, 2008-Ohio-4081, 894 N.E.2d 35, ¶ 17; *see also Global Knowledge Training, L.L.C. v. Levin*, 127 Ohio St.3d 34, 2010-Ohio-4411, 936 N.E.2d 463, ¶ 15 (specification requirement of R.C. 5717.02 constitutes a "jurisdictional prerequisit[e] to the exercise of authority by the BTA or this court on appeal").

---

[7] In 2013, the operative language of R.C. 5717.02 was changed; the statute now requires a "short and plain statement of the claimed errors in the determination," while granting an option to amend the notice later in the proceedings. R.C. 5717.02(C). Because the notice of appeal to the BTA in this case was filed before the enactment of the 2013 legislation, we apply the earlier version of the statute.

**{¶ 86}** The tax commissioner's determination specifically finds that "[t]here is no evidence that people assemble to worship together on the subject property used exclusively as a radio station." The record suggests that that determination may not be accurate, and in its brief to this court, appellant asserts that the BTA erred in failing to consider whether the property should be split into exempt and taxable parts.

**{¶ 87}** But even if the claim has merit, it is jurisdictionally barred because it was not raised at the BTA. Nothing in appellant's notice of appeal to the BTA asserted that the commissioner erred by not considering actual on-site worship services at the broadcasting facility or otherwise suggested that the nature of this case might justify split-listing portions of the property as exempt.

**{¶ 88}** A taxpayer is required to challenge a specific finding of the tax commissioner in order to preserve the issue before the BTA. *Ellwood Engineered Castings Co. v. Zaino*, 98 Ohio St.3d 424, 2003-Ohio-1812, 786 N.E.2d 458, ¶ 23. Appellant did not do so, and its failure bars it from raising the issue before this court. *See Osborne Bros. Welding Supply, Inc. v. Limbach*, 40 Ohio St.3d 175, 178, 532 N.E.2d 739 (1988).

## CONCLUSION

**{¶ 89}** I would hold that the tax commissioner properly denied tax-exempt status under R.C. 5709.02(A)(2). I would also deny on the merits appellant's argument based on collateral estoppel, and I would reject as waived appellant's partial-exemption claim.

LANZINGER, J., concurs in the foregoing opinion.

————————————

**LANZINGER J., dissenting.**

**{¶ 90}** Property-tax exemptions are to be strictly construed because they are in derogation of equal rights. *Cincinnati College v. State*, 19 Ohio 110, 115 (1850). The exemption for a house of public worship, R.C. 5709.07(A)(2), exempts

"[h]ouses used *exclusively* for public worship * * * and the ground attached to them that is not leased or otherwise used with a view to profit and that is necessary for their property occupancy, use, and enjoyment." (Emphasis added.)

{¶ 91} I cannot accept that interpreting the word "exclusively" to mean "primarily" in this case is a strict construction of this property-tax exemption. More than a century ago, this court interpreted language virtually identical to that contained in R.C. 5709.07(A)(2) as standing for the principle that "[t]he exemption is not of such houses as may be used for the *support* of public worship; but of houses used *exclusively* as places of public worship." (Emphasis sic.) *Watterson v. Halliday*, 77 Ohio St. 150, 173, 82 N.E. 962 (1907).

{¶ 92} The word "exclusively" as used in the statute has to mean something. The origin of the "primary use" test applied by the majority can be traced to our decision in *In re Bond Hill-Roselawn Hebrew School*, 151 Ohio St. 70, 84 N.E.2d 270 (1949), in which we considered whether the public-worship exemption applied to a building where the first floor was "used exclusively for public worship" and the second floor was used as living quarters for a caretaker's family. *Id.* at 71. We first observed that an overly literal construction of the exemption could prevent every application of the exemption, since "[i]t would not be difficult to show some slight use of any church building for a purpose other than public worship," for example, when a room of the church was used to entertain children during church services, when part of the church building was used for Boy Scout meetings, or when part of the church was used to prepare a church supper. *Id.* at 72-73. We reversed the Board of Tax Appeals' ("BTA") holding denying the exemption as an unreasonable interpretation of its application to the church building. *Id.* at 78.

{¶ 93} In a later case, the question was whether the parish hall in the basement of a building housing a church qualified for the R.C. 5709.07 exemption. *Bishop v. Kinney*, 2 Ohio St.3d 52, 442 N.E.2d 764 (1982). The BTA had found that the primary use of the parish hall, which was used in part as classrooms for

religious education, retreats, a summer Bible school, and post-worship breakfasts, "was religious in nature" but not used "exclusively for public worship" because it was also used for social gatherings and bingo games. *Id*. at 52. We held that a tax exemption for the parish hall was proper because the BTA found that the primary use of the parish hall was religious in nature and the tax commissioner had conceded that the primary use constituted "public worship" within the meaning of R.C. 5709.07. *Id.* at 54.

{¶ 94} Thus, we applied the primary-use test in both *Bond Hill* and *Bishop* to determine whether an *auxiliary* use of a building otherwise used *exclusively* for public worship affected the tax-exempt status of those buildings. *See Summit United Methodist Church v. Kinney*, 7 Ohio St.3d 13, 15, 455 N.E.2d 669 (1983) (the educational wing of a parish center used as Sunday school classrooms and leased to a public university, which used the space as a day-care center during the week, was not primarily religious in nature and not entitled to an exemption under R.C. 5709.07). We have also applied the primary-use test to determine whether buildings or land *surrounding* buildings used exclusively as churches defeated tax-exempt status. *Faith Fellowship Ministries, Inc. v. Limbach*, 32 Ohio St.3d 432, 436-438, 513 N.E.2d 1340 (1987) (lead opinion) (a chapel in a church complex used for children's church services in the summer and adult church services in the winter was exempt from taxation; a building used as a boiler building was necessary for the operation of exempt buildings on the church complex and consequently exempt under the primary-purpose test; buildings used as a cafeteria, sleeping rooms, a gymnasium, and a retreat house were merely supportive of or incidental to the public-worship function and not exempt from taxation; and a building used for storage and a vacant building were not exempt from taxation); *Full Gospel Apostolic Church v. Limbach*, 46 Ohio St.3d 195, 196, 546 N.E.2d 403 (1989) (the sporadic use of 47 acres surrounding a church sanctuary and associated buildings

for outdoor revivals and congregational services did not satisfy the primary-purpose test as applied to surrounding areas).

{¶ 95} In each of the cases cited by appellant and the majority in support of the primary-purpose test, that test was applied to determine whether the exemption applied to buildings or portions of buildings auxiliary to traditional church buildings or in other words, to buildings used *exclusively* for public worship. *See* majority opinion at ¶ 22. In other words, we have applied the primary-purpose test to those auxiliary buildings or portions of buildings only when there existed a primary building used exclusively for public worship. Never before have we expanded the exemption, which again must be strictly construed, to property like the one in the present case—a radio station, which is so clearly unlike the traditional church buildings exclusively used for public worship to which we have applied the exemption in the past.

{¶ 96} There is no church here.

{¶ 97} I accordingly dissent and join Chief Justice O'Connor's dissent in full.

O'NEILL, J., concurs in all but the final sentence of the foregoing opinion.

_____

Isaac, Wiles, Burkholder & Teetor, L.L.C., and Brian M. Zets, for appellant.

Michael DeWine, Attorney General, and Daniel G. Kim, Assistant Attorney General, for appellee Tax Commissioner.

_____